Jason Flanders (Bar No. 238007)
Email: jrf@atalawgroup.com
J. Thomas Brett (Bar. No. 315820)
Email: jtb@atalawgroup.com
AQUA TERRA AERIS LAW GROUP LLP
4030 Martin Luther King Jr. Way
Oakland, CA 94609
Phone: (202) 9016

Barak J. Kamelgard (Bar No. 298822)
Email: Barak@lawaterkeeper.org
Benjamin A. Harris (Bar No. 313193)
Email: ben@lawaterkeeper.org
LOS ANGELES WATERKEEPER
360 E 2nd Street Suite 250
Los Angeles, CA  90012
Phone: (310) 394-6162

*Attorneys for Plaintiff*
LOS ANGELES WATERKEEPER

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOS ANGELES WATERKEEPER, a California non-profit association,<br><br>              Plaintiff,<br><br>    v.<br><br>ASTRO PAK CORPORATION, a Delaware corporation,<br><br><br>         Defendant. | Civil Case No.:<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.*)** |

1       Los Angeles Waterkeeper ("LA Waterkeeper" or "Plaintiff"), by and through its

2 counsel, hereby alleges:

3 **I.    JURISDICTION AND VENUE**

4       1.    This is a civil suit brought under the citizen suit enforcement provision of

5 the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act"

6 or "CWA"). *See* 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the

7 parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and

8 2201 (an action for declaratory and injunctive relief arising under the Constitution and

9 laws of the United States).

10       2.    On April 13, 2023, LA Waterkeeper issued a 60-day notice letter ("April

11 Notice Letter"), to the registered agent for service of process (40 C.F.R. § 135.2(a)(2))

12 for Astro Pak Corporation ("Astro Pak" or "Defendant"), as the owners and operators of

13 the Facility under its control. The Notice Letter informed Defendant of its violations of

14 California's Storm Water Permit for Discharges of Storm Water Associated with

15 Industrial Activities (*National Pollutant Discharge Elimination System (NPDES) General*

16 *Permit No. CAS000001, State Water Resources Control Board Water Quality Order No*.

17 2014-0057-DWQ) and amended by Order No. 2015-0122 –DWQ and incorporating: 1)

18 Federal Sufficiently Sensitive Test Method Ruling; 2) Total Maximum Daily Loads

19 ("TMDL") Implementation Requirements; and 3) Statewide Compliance Options

20 Incentivizing On-Site or Regional Storm Water Capture and Use, and as subsequently

21 amended by Order 2018-0028-DWQ (effective July 1, 2020) (hereafter the "Storm Water

22 Permit") and the Clean Water Act at the industrial facility located at 12201 Pangborn

23 Ave., Downey, CA 90241 with Waste Discharger Identification Number ("WDID") 4

24 19I002927 (hereafter, the "Facility").

25       3.    The Notice Letter informed Defendant of Plaintiff's intent to file suit against

26 Defendant to enforce the Storm Water Permit and the Clean Water Act.

27       4.    In addition to the Notice Letter sent on April 13, 2023 to Defendant's agent

28 for service of process, on March 24, 2023 Plaintiff sent a Notice Letter ("March Notice

Letter") to Astro Pak's Chief Executive Officer, EHS Manager. The March Notice Letter was also sent to the Acting Administrator of the United States Environmental Protection Agency ("EPA"), the Acting Administrator of EPA Region IX, the Executive Director of the State Water Resources Control Board ("State Board"), and the Executive Officer of the Regional Water Quality Control Board, Los Angeles Region, ("Regional Board") as required by Section 505(b) of the CWA, 33 U.S.C. § 1365(b)(1)(A). The March and April Notice Letters are attached hereto as **Exhibits A & B,** respectively, and are fully incorporated herein by reference.

5.      More than sixty (60) days have passed since both the March and April Notice Letters were served on the Defendant and the State and Federal agencies. Plaintiff is informed and believes, and thereon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting an action to redress the violations alleged in the Notice Letter and in this complaint. *See* 33 U.S.C. § 1365(b)(1)(B). This action is not barred by any prior administrative penalty under Section 309(g) of the CWA, 33 U.S.C. § 1319(g).

6.      Venue is proper in the Central District of California pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this judicial district.

7.      Plaintiff seeks relief for Defendant's substantive and procedural violations of the Storm Water Permit and the Clean Water Act resulting from industrial activities at the Facility.

## II.      INTRODUCTION

8.      With every significant rainfall event, hundreds of millions of gallons of polluted rainwater, originating from industrial operations such as the Facility referenced herein, pour into the storm drains and local waterways. The consensus among regulatory agencies and water quality specialists is that storm water pollution accounts for more than half of the total pollution entering marine and river environments each year. These surface waters, known as Receiving Waters, are ecologically sensitive areas. Although

pollution and habitat destruction have drastically diminished once abundant and varied fisheries, these waters are still essential habitat for dozens of fish and bird species as well as macro-invertebrate and invertebrate species. Storm water and non-storm water contain sediment, heavy metals, such as aluminum, iron, chromium, copper, lead, mercury, nickel, and zinc, as well as, high concentrations of nitrate and nitrite, and other pollutants. Exposure to polluted storm water harms the special aesthetic and recreational significance that the surface waters have for people in the surrounding communities. The public's use of the surface waters exposes many people to toxic metals and other contaminants in storm water and non-storm water discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation, are also impaired by polluted discharges to the Receiving Waters.

9. High concentrations of total suspended solids ("TSS") degrade optical water quality by reducing water clarity and decreasing light available to support photosynthesis. TSS has been shown to alter predator-prey relationships (for example, turbid water may make it difficult for fish to hunt prey). Deposited solids alter fish habitat, aquatic plants, and benthic organisms. TSS can also be harmful to aquatic life because numerous pollutants, including metals and polycyclic aromatic hydrocarbons, are absorbed onto TSS. Thus, higher concentrations of TSS result in higher concentrations of toxins associated with those sediments. Inorganic sediments, including settleable matter and suspended solids, have been shown to negatively impact species richness, diversity, and total biomass of filter feeding aquatic organisms on bottom surfaces. Storm water discharged with high pH can damage the gills and skin of aquatic organisms and cause death at levels above 10 standard units. The pH scale is logarithmic, and the solubility of a substance varies as a function of the pH of a solution. A one-whole-unit change in SU represents a tenfold increase or decrease in ion concentration. If the pH of water is too high or too low, the aquatic organisms living within it will become stressed or die.

10. This complaint seeks a declaratory judgment, injunctive relief, the imposition of civil penalties, and the award of costs, including attorney and expert

1 | witness fees, for Defendant's substantive and procedural violations of the Storm Water
2 | Permit and the Clean Water Act resulting from Defendant's operations at the Facility.[1]

3 | 11.    Plaintiff specifically alleges violations regarding Defendant's discharge of
4 | pollutants from the Facility into waters of the United States; violations of the monitoring,
5 | reporting, and best management practice requirements; and violations of other procedural
6 | and substantive requirements of the Storm Water Permit and the Clean Water Act, are
7 | ongoing and continuous.

8 | **III.    PARTIES**

9 | **A.    Los Angeles Waterkeeper**

10 | 12.    LA Waterkeeper is a non-profit 501(c)(3) public benefit corporation
11 | organized under the laws of the State of California. LA Waterkeeper maintains an office
12 | at 360 E. Second Street, Suite 250, Los Angeles, California 90012.

13 | 13.    LA Waterkeeper's members live and/or recreate in and around Los Angeles
14 | and Long Beach area. LA Waterkeeper is dedicated to the preservation, protection, and
15 | defense of the environment, wildlife, and natural resources of local surface waters. To
16 | further these goals, LA Waterkeeper actively seeks federal and state agency
17 | implementation of the Clean Water Act and, where necessary, directly initiates
18 | enforcement actions on behalf of itself and others.

19 | 14.    LA Waterkeeper members work, own homes and live in Los Angeles
20 | County and use and enjoy the waters near the Facility, including the San Gabriel River
21 | and the bordering parks, pathways, golf, courses and athletic fields, and further
22 | downstream, the San Gabriel River Estuary, Seal Beach, and the Pacific Ocean the
23 | ("Receiving Waters") for biking, boating, kayaking, viewing wildlife, walking, running,
24 | and horseback riding.

25 | 15.    Discharges of polluted storm water and non-storm water from the Facility
26 | degrade water quality and harm aquatic life in the San Gabriel River, Seal Beach, and the

27 |

28 | _____

[1] The Facility is fully described in Section V below.

Complaint for Declaratory and Injunctive    5
and Civil Penalties Relief

Pacific Ocean, and impair LA Waterkeeper's members use and enjoyment of those waters.

16.     The violations of the Storm Water Permit and Clean Water Act at the Facility are ongoing and continuous, including but not limited to Defendant's discharge of polluted storm water from the Facility. Thus, the interests Plaintiff's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Storm Water Permit and the Clean Water Act.

17.     Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and its members, for which they have no plain, speedy or adequate remedy at law.

18.     The interests of LA Waterkeeper's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Clean Water Act and the Storm Water Permit. The relief sought herein will redress the harm to Plaintiff caused by Defendant's activities.

**B.     The Owners and/or Operators of the Facility**

19.     Plaintiff is informed and believes, and thereon alleges, that Astro Pak maintains its headquarters at 270 Baker Street East, Suite 100, Costa Mesa, California 92626.

20.     Plaintiff is informed and believes, and thereon alleges, that Astro Pak Corporation is the owner and operator of the Facility.

21.     Plaintiff is informed and believes, and thereon alleges, that Astro Pak Corporation is an active Delaware corporation registered in California.

22.     Plaintiff is informed and believes, and thereon alleges, that the name and address of the Registered Agent for Astro Pak is CSC Lawyers Incorporating Service National Registered Agents, c/o Amanda Garcia, 330 N. Brand Boulevard, Suite 700, Glendale, California 91203.

23.     LA Waterkeeper refers to Defendant Astro Pak and its management herein as the "Owners/Operators" of the Facility.

# IV.    STATUTORY BACKGROUND

## A.    The Clean Water Act

24.    Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated sections of the CWA. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to Section 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342(b).

25.    Section 402(p) of the CWA establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program. 33 U.S.C. § 1342(p). States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C. § 1342.

26.    Section 301(b) of the Clean Water Act requires that all point source dischargers, including those discharging polluted storm water, must achieve technology-based effluent limitations by utilizing Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. *See* 33 U.S.C. § 1311(b).

27.    The Clean Water Act requires point source discharges of pollutants to navigable waters be regulated by an NPDES permit. 33 U.S.C. §§ 1311(a) and 1342.; *see* 40 C.F.R. § 122.26(c)(1).

28.    The "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12); *see* 40 C.F.R. § 122.2.

29.    The term "pollutant" includes "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological

materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6); *see* 40 C.F.R. § 122.2.

30.     The term "point source" means any "discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14); *see* 40 C.F.R. § 122.2.

31.     "Navigable waters" means "Waters of the United States." 33 U.S.C. § 1362(7); 33 CFR § 328.3.

32.     Section 505(a)(1) and Section 505(f) of the Clean Water Act provide for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." *See* 33 U.S.C. §§ 1365(a)(1) and 1365(f).

33.     The Defendant is a "person[s]" within the meaning of Section 502(5) of the Clean Water Act, 33 U.S.C. § 1362(5).

34.     An action for injunctive relief is authorized under Section 505(a) of the CWA, 33 U.S.C. § 1365(a).

35.     Pursuant to Section 309(d) of the Act (33 U.S.C. § 1319(d)) and the Adjustment of Civil Monetary Penalties for Inflation (40 C.F.R. § 19.4), each separate violation of the CWA occurring after December 20, 2015 commencing five years prior to the date of Notice of Violation and Intent to File Suit subjects Astro Pak to a penalty of up to $64,618 per day per violation.

36.     Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), permits prevailing or substantially prevailing parties to recover litigation costs, including attorneys' fees, experts' fees, and consultants' fees.

**B.     California's Storm Water Permit**

37.     Section 402(b) of the CWA, 33 U.S.C. § 1342(b), allows each state to

administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water. States with approved NPDES permit programs are authorized by Section 402(b) to regulate industrial storm water discharges through individual NPDES permits issued to dischargers and/or through the issuance of a statewide general NPDES permit applicable to all industrial storm water dischargers. *See id.*

38.     Pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, the Administrator of the EPA has authorized California to issue NPDES permits, including general NPDES permits. California has designated the State Board and the Regional Boards to administer its NPDES program. *City of Rancho Cucamonga v. Regional Water Quality Control Bd.*, 135 Cal. App. 4th 1377, 1380-81 (2006). In California, the State Board is charged with regulating pollutants to protect California's water resources. *See* Cal. Water Code § 13001. The Storm Water Permit is a statewide general NPDES permit issued by the State Board pursuant to Section 402 of the CWA, 33 U.S.C. §§ 1342(b), (p), and 40 C.F.R § 123.25. Violations of the Storm Water Permit are also violations of the CWA. Storm Water Permit, Section XXI(A).

39.     Section 303 of the CWA, 33 U.S.C. § 1313, requires states to adopt Water Quality Standards, including water quality objectives and beneficial uses for navigable waters of the United States. 33 U.S.C. § 1313(a). The CWA prohibits discharges from causing or contributing to a violation of such state Water Quality Standards. *See* 33 U.S.C. § 1311(b)(1)(C); 40 C.F.R. §§ 122.4(a), (d); 40 C.F.R. § 122.44(d)(1).

40.     The State Board elected to issue a statewide general permit for industrial discharges. The State Board issued the Storm Water Permit on or about November 19, 1991, modified the Storm Water Permit on or about September 17, 1992, and reissued the Storm Water Permit on or about April 17, 1997, pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

41.     On July 1, 2015, the current Storm Water Permit became effective and was issued as *NPDES General Permit No. CAS000001 State Water Resources Control Board*

*Water Quality Order No. 2014-0057-DWQ*. Storm Water Permit, Section I(A) (Finding 4).

42.     On November 6, 2018, the State Board amended the Storm Water Permit with Order No. No. 2015-0122 –DWQ, incorporating: 1) Federal Sufficiently Sensitive Test Method Ruling; 2) TMDL Implementation Requirements; and 3) Statewide Compliance Options Incentivizing On-Site or Regional Storm Water Capture and Use ("2018 Permit Amendment").

43.     In order to discharge storm water lawfully in California, industrial dischargers must secure coverage under the Storm Water Permit and comply with its terms, or obtain and comply with an individual NPDES permit. Storm Water Permit, Section I.A (Findings 8, 12). Prior to beginning industrial operations, dischargers are required to apply for coverage under the Storm Water Permit by submitting a Notice of Intent to Comply with the Terms of the Storm Water Permit to Discharge Storm Water Associated with Industrial Activity ("NOI") to the State Board. Storm Water Permit, Section I.A (Finding 17), Section II.B.

## C.    The Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations

44.     The Storm Water Permit contains certain absolute prohibitions. The Storm Water Permit prohibits the direct or indirect discharge of materials other than storm water ("non-storm water discharges"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. Storm Water Permit, Discharge Prohibition III(B).

45.     Section V(A) of the Storm Water Permit requires dischargers to reduce or prevent pollutants associated with industrial activity in storm water discharges through the implementation of Best Available Technology Economically Achievable ("BAT") for toxic or non-conventional pollutants, and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are

listed at 40 C.F.R. § 401.16 and include biological oxygen demand, TSS, oil and grease ("O&G"), pH, and fecal coliform.

46.     Discharge Prohibition III(C) of the Storm Water Permit prohibits storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

47.     Under the CWA and the Storm Water Permit, dischargers must employ Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate storm water pollution. 33 U.S.C. § 1311(b). Storm Water Permit, Section V(A). EPA has developed benchmark levels ("Benchmarks") that are objective guidelines to evaluate whether a permittee's BMPs achieve compliance with the BAT/BCT standards. *See* Final National Pollutant Discharge Elimination System (NPDES) General Permit for Storm Water Discharges From Industrial Activities ("Multi-Sector Permit"), 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); Multi-Sector Permit, 73 Fed. Reg. 56,572, 56,574 (Sept. 29, 2008); Multi-Sector Permit, 65 Fed. Reg. 64,746, 64,766-67 (Oct. 30, 2000).

48.     The EPA's most recent, 2021 Parameter Benchmark Values for the following parameters, among others, are as follows: TSS—100 mg/L; aluminum—1.1 mg/L; nitrate plus nitrite as nitrogen ("N+N")—0.68 mg/L; lead—0.082 mg/L; cyanide—0.022 mg/L; copper—0.00519 mg/L; zinc—0.12 mg/L; pH—6.0-9.0 s.u; biological oxygen demand—30 mg/L; and chemical oxygen demand—120 mg/L. Additional EPA Benchmarks for heavy metals, which depend on the hardness of the receiving water, also apply to storm water discharges from the Facility.

49.     The Storm Water Permit contains Numeric Action Levels ("NALs") that generally mirror the 2008 EPA Benchmark Values. *See* Storm Water Permit, Section I(M)(Finding 62).  Annual NALs, not accounting for water hardness, for the following parameters are: pH—6.0 – 9.0 standard units; TSS—100 mg/L; copper—0.0332 mg/L; zinc—0.26 mg/L; nickel—1.02 mg/L;  lead—.262 mg/L; cyanide—0.022 mg/L; iron—1.0 mg/L; N+N—0.68 mg/L; O&G—15 mg/L; and aluminum—0.75 mg/L; biological oxygen demand—30 mg/L; and chemical oxygen demand—120 mg/L. Storm Water Permit, Table 2 at 47. Instantaneous Maximum NALs, for the following parameters are:

pH—6.0 – 9.0 s.u.; TSS—400mg/L; O&G—25mg/L. *Id*.

50. An annual NAL exceedance occurs when the average of all the analytical results for a parameter from samples taken within a reporting year exceeds the annual NAL value for that parameter. An instantaneous maximum NAL exceedance occurs when two (2) or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value or are outside of the instantaneous maximum NAL range for pH. Stormwater Permit Section XII.A.

51. Receiving Water Limitation VI(B) of the Storm Water Permit prohibits storm water discharges from adversely impacting human health or the environment.

52. Discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of the Storm Water Permit's Receiving Water Limitation. Storm Water Permit, Section VI(B).

53. Receiving Water Limitation VI(A) of the Storm Water Permit prohibit storm water discharges that cause or contribute to an exceedance of any "applicable Water Quality Standard in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan."

54. Water Quality Standards ("WQS") are pollutant concentration levels determined by the State Board, the various Regional Boards, and the EPA to be protective of the beneficial uses of the waters that receive polluted discharges.

55. The State of California regulates water quality through the State Board and the nine Regional Boards. Each Regional Board maintains a separate Water Quality Control Plan which contains WQS for water bodies within its geographic area.

56. The State Water Quality Control Board, Los Angeles Region, has issued the Water Quality Control Plan for the Los Angeles Region ("the Basin Plan") to establish water quality objectives, implementation plans for point and non-point source discharges, prohibitions, and to further statewide plans and policies. The Basin Plan sets forth water quality objectives for dissolved metals such as aluminum, arsenic, and mercury. Basin Plan, Table 3-8. The Basin Plan states that the waters shall not receive sediment,

settleable materials, or suspended materials that cause nuisance or adversely affect the waters' beneficial uses. *Id*. at 3-44. The Basin Plan also provides that "Toxic pollutants shall not be present at levels that will bioaccumulate in aquatic life to levels which are harmful to aquatic life or human health." *Id*. at 3-29.

57.     The Basin Plan's WQS also require a narrower pH range of 6.5 – 8.5 pH units for inland surface waters such as the San Gabriel River and its watershed.

58.     The Basin Plan specifies potential and existing beneficial uses for the San Gabriel River including municipal and domestic supply, industrial process and service supply, warm freshwater habitat, wildlife habitat, and habitat for rare, threatened, or endangered species. Basin Plan, Table 2-1. The Basin Plan further specifies beneficial uses for the San Gabriel River Estuary. *Id*.

59.     Surface waters that cannot support the Beneficial Uses of those waters listed in the Basin Plan are designated as impaired water bodies pursuant to Section 303(d) of the Clean Water Act, 33 U.S.C. §1313(d).

60.     Reach 2 of the San Gabriel River, into which the Facility discharges, is impaired for lead, cyanide, and temperature. It has been proposed in the Draft California 2024 Integrated Report that Reach 2 will also be listed as impaired for aluminum and indicator bacteria.

61.     Reach 1 of the San Gabriel River is impaired for pH and temperature. It has been proposed in the Draft California 2024 Integrated Report that Reach 1 will also be listed as impaired for DDT, O&G, and indicator bacteria. Lower reaches of the San Gabriel River and the San Gabriel River Estuary are also listed for impairments on the Section 303(d) list; specifically, copper, dioxin, indicator bacteria, nickel, and dissolved oxygen, and it has been proposed in the Draft California 2024 Integrated Report that they will also be listed as impaired for chlordane, chlorine, temperature, and toxicity. The Receiving Waters are impaired, and Defendant's discharges of pollutants above the WQS contributes to the continued impairment of the receiving waters' beneficial uses.

62.     In addition, EPA has promulgated WQS for toxic priority pollutants in all

California water bodies ("California Toxics Rule" or "CTR"), which apply to the Receiving Waters, unless expressly superseded by the Basin Plan. 40 C.F.R. § 131.38. The CTR sets forth lower numeric limits for zinc and other pollutants; CTR criteria can be as low as, 0.065 mg/L for lead, 0.013 mg/L for copper, 0.022 mg/L for cyanide, 0.47 mg/L for nickel, and 0.12 mg/L for zinc in freshwater surface waters with water hardness calculation of 50 mg/L.[2]

63.     The CTR includes further numeric criteria set to protect human health and the environment in the State of California. *See* Establishment of Numeric Criteria for Priority Toxic Pollutants for the State of California Factsheet, EPA-823-00-008 (April 2000), available at: https://www.epa.gov/wqs-tech/water-quality-standards-establishment-numeric-criteria-priority-toxic-pollutants-state.

64.     Discharges with pollutant levels in excess of the CTR criteria, the Basin Plan, and/or other applicable WQS are violations of the Storm Water Permit's Receiving Water Limitations. *See* Storm Water Permit, Section VI(A).

**D.     The Storm Water Permit's Numeric Effluent Limitations**

65.     Effective July 1, 2020, the Storm Water Permit establishes numeric effluent limitations ("NELs") for facilities that discharge storm water associated with industrial activities into water bodies that have approved TMDLs set forth in Storm Water Permit, Attachment E. TMDLs in place for pollutants discharged from industrial facilities to the San Gabriel River include metals and selenium. Storm Water Permit, Attachment E, Table E-1.Discharges from the Facility are subject to the San Gabriel River TMDL requirements for metals, which include the following NELs: lead—0.166 mg/L. Storm Water Permit, Attachment E, Table E-2.

66.     An exceedance of an NEL constitutes a violation of the General Permit. General Permit, Attachment C at 5. An NEL exceedance occurs when two (2) of more

---

[2] The CTR numeric limits, or "criteria," are expressed as dissolved metal concentrations in the CTR, but the Storm Water Permit requires permittees to report their sample results as total metal concentrations. *See* Storm Water Permit, Attachment H at 18.

analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NEL value listed in Table E-2 of Attachment E to the General Permit. *Id*.

**E.    The Storm Water Permit's Storm Water Pollution Prevention Plan Requirements**

67.    Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") at the time industrial activities begin. Storm Water Permit, Sections I(I)(Finding 54) and X(B). The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water and authorized non-storm water discharges from the facility. Storm Water Permit, Section X(G). The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water and authorized non-storm water discharges from the facility. Storm Water Permit, Section X(G). The SWPPP must identify and implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges. Storm Water Permit, Section X(H). The SWPPP must include BMPs that achieve pollutant discharge reductions attainable via BAT and BCT. Storm Water Permit, Sections I(D) (Finding 32) and X(C).

68.    The SWPPP must include: a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutants control measures; a description of storm water management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges; the identification and elimination of non-storm water discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a

description of dust and particulate-generating activities; and a description of individuals and its current responsibilities for developing and implementing the SWPPP. Storm Water Permit, Section X.

69. The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities. Storm Water Permit, Section X.

70. The Storm Water Permit requires the discharger to evaluate the SWPPP on an annual basis and revise it as necessary to ensure compliance with the Storm Water Permit. Storm Water Permit, Section X(A)-(B). The Storm Water Permit also requires that the discharger conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports and sampling and analysis results, a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system, a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed, and a visual inspection of equipment needed to implement the SWPPP. Storm Water Permit, Section X(B) and Section XV.

71. The SWPPP and site maps must be assessed annually and revised as necessary to ensure accuracy and effectiveness. Storm Water Permit, Sections I(J) (Finding 55) and X(B)(1). Significant SWPPP revisions must be certified and submitted by the discharger via the State Board's electronic database, called the Storm Water Multiple Application & Report Tracking System ("SMARTS") within 30 days. Storm Water Permit, Section X(B)(2). Dischargers are required to submit revisions to the SWPPP that are determined to not be significant every three (3) months in the reporting year. *Id.* at Section X(B)(3); Storm Water Permit, Fact Sheet, Section II(I)(1).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**F.    The Storm Water Permit's Monitoring Implementation Program Requirements**

72.    The Storm Water Permit requires facility operators to develop and implement a Monitoring Implementation Plan ("MIP"). Storm Water Permit Sections X(I) and XI(A)–(D). The MIP must ensure that storm water discharges comply with the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations specified in the Storm Water Permit. Storm Water Permit Section XI. The MIP must ensure that practices at the facility to prevent or reduce pollutants in storm water and authorized non-storm water discharges are evaluated and revised to meet changing conditions at the facility, including revision of the SWPPP. *Id.*

73.    Further objectives of the MIP are to ensure that BMPs have been adequately developed and implemented, revised if necessary, and to ensure that storm water and non-storm water discharges comply with the Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. Storm Water Permit, Section XI.

74.    The MIP aids in the implementation and revision of the SWPPP and measures the effectiveness of BMPs to prevent or reduce pollutants in storm water discharges. *Id*.

75.    The Storm Water Permit requires facility operators to monitor and sample storm water discharges to ensure that the facility is complying with the terms of the permit. Storm Water Permit, Sections I(J) (Findings 55–56) and XI.

76.    Section XI(A)(4) of the Storm Water Permit requires that the MIP shall be revised as necessary to ensure compliance with the Storm Water Permit.

77.    Section XI(A) of the Storm Water Permit requires dischargers to conduct monthly visual observations of storm water discharges.

78.    Section XI(A)(2) of the Storm Water Permit requires dischargers to document the presence of any floating and suspended materials, O&G, discolorations, turbidity, or odor in the discharge, and the source of any pollutants in storm water

discharges from the facility. Dischargers are required to maintain records of observations, observation dates, discharge locations observed, and responses taken to reduce or prevent pollutants from contacting storm water discharges. *See* Storm Water Permit, Section XI(A)(3). The Storm Water Permit also requires dischargers to revise the SWPPP as necessary to ensure that BMPs are effectively reducing and/or eliminating pollutants at the facility. Storm Water Permit, Section X(B)(1).

79.    The Storm Water Permit requires dischargers to visually observe and collect samples of storm water discharges from all locations where storm water is discharged. Storm Water Permit, Section XI(B)(4).

80.    Section XI(B)(1) of the Storm Water Permit requires sampling if a precipitation event produces a discharge for at least one drainage area, and it is preceded by forty-eight (48) hours with no discharge from any drainage area ("Qualifying Storm Event" or "QSE").

81.    Section XI(B)(2) of the Storm Water Permit requires dischargers to collect and analyze storm water samples from two (2) QSEs within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30).

82.    Section XI(B)(6) of the Storm Water Permit requires dischargers to analyze storm water samples for TSS, O&G, pH, and additional parameters identified by the discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment, additional applicable industrial parameters related to receiving waters with 303(d) listed impairments or approved TMDLs, and additional parameters required by the Regional Water Board.

83.    All facilities are required to sample storm water for TSS, O&G, and pH. The Facility's NOI classifies the Facility under Standard Industrial Classification Code ("SIC") 3471, covering electroplating, plating, polishing, anodizing and coloring. Under SIC Code 3471, Astro Pak is also required to sample storm water for iron, aluminum, zinc, and N+N. Facilities must also sample and analyze for additional parameters

identified on a facility-specific basis to reflect a facilities' pollutant source assessment, as required by the Storm Water Permit and the Regional Board, and additional parameters related to receiving waters with 303(d) listed impairments. Storm Water Permit, Section XI(B)(6) When self-reporting storm water sample results, Defendant samples for those pollutants listed above in this paragraph.

84.     Section XVI of the Storm Water Permit requires dischargers to submit an annual report with a Compliance Checklist that indicates whether a Discharger complies with, and has addressed all applicable requirements of the permit, an explanation for any non-compliance of requirements within the reporting year, as indicated in the Compliance Checklist, an identification, including page numbers and/or Sections, of all revisions made to the SWPPP within the reporting year, and the date(s) of the Annual Evaluation.

## G.     Exceedance Response Action Requirements

85.     When the 2015 Permit became effective on July 1, 2015, all permittees were in "Baseline status." See 2015 Permit, Section XII(B). A permittee's Baseline status for any given parameter changes to "Level 1 status" if sampling results indicate a NAL exceedance for that same parameter. *See* Storm Water Permit, Section XII(C).

86.     Level 1 status commences on July 1 following the reporting year during which the exceedance(s) occurred. *See* Storm Water Permit, Section XII(C). By October 1 following commencement of Level 1 status, permittees are required to: complete an evaluation, with the assistance of a Qualified Industrial Stormwater Practitioner ("QISP"), of the industrial pollutant sources at the facility that are or may be related to the NAL exceedance(s); and identify in the evaluation the corresponding BMPs in the SWPPP and any additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances and to comply with the requirements of Storm Water Permit. *See* Storm Water Permit Section XII(C)(1)(a)-(c).

87.     Although the evaluation may focus on the drainage areas where the NAL exceedance(s) occurred, all drainage areas shall be evaluated. *See* Storm Water Permit, Section XII(C)(1)(c).

88.    Based upon this Level 1 status evaluation, the permittee is required to, as soon as practicable but no later than January 1 following commencement of Level 1 status, revise the SWPPP as necessary and implement any additional BMPs identified in the evaluation, certify and submit via SMARTS a Level 1 Exceedance Response Action ("ERA") Report prepared by a QISP that includes the a summary of the Level 1 ERA Evaluation and a detailed description of the SWPPP revisions and any additional BMPs for each parameter that exceeded an NAL. *See* Storm Water Permit, Section XII(C)(2)(a)(i)-(ii).

89.    The permittee in Level 1 status must also certify and submit via SMARTS the QISP's identification number, name, and contact information (telephone number, e-mail address) no later than January 1 following commencement of Level 1 status. *See* Storm Water Permit, Section XII(C)(2)(a)(iii).

90.    A permittee's Level 1 status for a parameter will return to Baseline status once a Level 1 ERA Report has been completed, all identified additional BMPs have been implemented, and results from four (4) consecutive qualified storm events that were sampled subsequent to BMP implementation indicate no additional NAL exceedances for that parameter. *See* Storm Water Permit, Section XII(C)(2)(b).

91.    A permittee's Level 1 status for any given parameter shall change to Level 2 status if sampling results indicate an NAL exceedance for that same parameter while the Discharger is in Level 1. Level 2 status commences on July 1 following the reporting year during which the NAL exceedance(s) occurred. *See* Storm Water Permit, Section XII(D).

92.    A Discharger in Level 2 status shall submit a Level 2 ERA Action Plan prepared by a QISP that addresses each new Level 2 NAL exceedance by January 1 following the reporting year during with the NAL exceedances occurred. On January 1 of the reporting year following the submittal of the Level 2 ERA Action Plan, a Discharger shall certify and submit a Level 2 ERA Technical Report prepared by a QISP to SMARTS. *See*, Storm Water Permit, Section XII(D).

# V.    STATEMENT OF FACTS

## A.    Astro Pak Facility Site Description, Industrial Activities, and Pollutant Sources at the Facility

93.    Defendant operates an industrial facility located at 12201 Pangborn Avenue, Downey, California 90241, in close proximity to the San Gabriel River. The Facility's NOI states that the site is approximately 2.2 acres, with approximately 1.4 acres of industrial area exposed to storm water. The Facility's primary industrial purpose is precision cleaning and passivation services. The Facility's SWPPP, last updated September 2020 ("Facility SWPPP"), states that the Facility operates Monday through Friday, 8:00 am to 5:00 pm, except Astro Pak holidays.

94.    Plaintiff is informed and believes, and thereon alleges, that industrial activities at the site, many of them conducted outdoors and exposed to storm water include, but are not limited to, storage of chemicals and materials, field services truck parking and equipment storage, deionized (DI) water conditioning, and transformers, gas-fired boilers, and air compressors. These activities occur at following areas identified in the Facility SWPPP: chemical drum bays, chemical storage lockers, corrosive spill pallet enclosure, dispensing drums, hazardous waste storage areas, empty container storage, truck loading area at warehouse dock, container transfer areas, hose, pips, and equipment storage areas, truck and trailer parking, trash bins, roofs and pavements. The main processing areas are in the clean room building and shop building.

95.    Truck and forklift traffic, commuter vehicle traffic and parking also occur at the Facility.

96.    Aluminum and metal shavings, chips, dust and particulates, and chemical sediment from the industrial activities at the Facility can accumulate around the Facility. Pollutants from these activities accumulate at the Facility and contribute to pollutants in storm water. Pollutants of concern at the Facility include but are not limited to, O&G, pH, TSS, N+N, iron, zinc, and aluminum.

97.    The Facility SWPPP also lists biological oxygen demand and chemical

1    oxygen demand in its pollutant source assessment.

2        98.    The industrial areas and associated activities generate and release pollutants

3    at the Facility which are discharged in storm water to the City of Downey municipal

4    storm drain on Pangborn Avenue, then into the San Gabriel River and Pacific Ocean

5    downstream.

6        99.    The San Gabriel River is located less than 0.1 miles to the east of the

7    Facility.

8        100.    Pursuant to the Facility SWPPP, storm water is conveyed to concrete swales

9    that flow to one of two storm water catch basin drains, where (during sampling events) it

10    is sampled prior to discharge to the Municipal Separate Storm Sewer System. Catch

11    Basins 001 and 002, each consists of a concrete sump approximately 3 on each side and 4

12    feet deep. A stainless-steel collar below the steel grate directs water flow through a filter

13    insert and then into underground connected to the infiltration system.

14        101.    Pursuant to the Facility's SWPPP, the infiltration system is designed to

15    infiltrate the projected drainage volume produced by either a maximum of a 0.75-inch

16    total storm event or a continuing 0.2-inch per hour storm event.

17        102.    The San Gabriel River, and the Pacific Ocean are waters of the United

18    States, and which, upon information and belief, receive stormwater discharges from the

19    Facility.

20    **B.    San Gabriel River**

21        103.    LA Waterkeeper's members utilize the Receiving Waters for recreation,

22    scientific study through pollution and habitat monitoring and restoration activities.

23        104.    The San Gabriel River watershed provides critical habitat for species,

24    including many that are endangered, threatened, rare, and endemic to Southern

25    California. These species include flora and fauna, including one of the largest runs of

26    steelhead trout in southern California and the largest remaining population of arroyo

27    chub.

28

### C.    The Facility Storm Water Permit Coverage

105.    SMARTS lists the current Facility WDID number for the Facility as 4 19I002927 and coverage under the Storm Water Permit as "Active."

106.    The NOI for the Facility lists the Receiving Water as the San Gabriel River.

107.    Via search of the SMARTS database, Plaintiff obtained the Facility SWPPP for the Facility, last revised in September 2020.

108.    Plaintiff is informed and believes, and thereon alleges, that Astro Pak has been operating with an inadequately developed or implemented SWPPP in violation of Storm Water Permit requirements since at least April 13, 2018. Astro Pak has failed to evaluate the effectiveness of its BMPs and to revise its SWPPP as necessary, resulting in the Facility's unlawful effluent limitation violations.

109.    Plaintiff is informed and believes, and thereon alleges, that the Facility Owners/Operators failed to implement any additional BMPs as required by the Storm Water Permit. As such, the Owners and/or Operators are in daily violation of this requirement of the Storm Water Permit.

110.    Plaintiff is informed and believes, and thereon alleges, that Facility Owners/Operators have failed to implement BMPs that achieve compliance with Storm Water Permit or the CWA.

111.    Plaintiff is informed and believes, and thereon alleges, that pollutants associated with the Facility include, but are not limited to: aluminum, zinc, nitrate + nitrite, pH, TSS, O&G,  iron, biological oxygen demand and chemical oxygen demand.

112.    Plaintiff is informed and believes, and thereon alleges, that Astro Pak has failed to implement the minimum BMPs required by the Storm Water Permit, including good housekeeping requirements; preventive maintenance requirements; spill and leak prevention and response requirements; material handling and waste management requirements; erosion and sediment controls; employee training and quality assurance; and record keeping. Storm Water Permit, Sections X(H)(1)(a)–(g). The Facility SWPPP does not contain a description of any erosion and sediment control BMPs that are in

place.

113.    Plaintiff is informed and believes, and thereon alleges, that Astro Pak has further failed to implement sufficient advanced BMPs necessary to reduce or prevent discharges of pollutants in its storm water sufficient to meet the BAT/BCT standards, including: exposure minimization BMPs; containment and discharge reduction BMPs; treatment control BMPs; or other advanced BMPs necessary to comply with the Storm Water Permit's effluent limitations. Storm Water Permit, Section X(H)(2) According to the Facility SWPPP, the Facility's advanced BMPs are limited to an infiltration system to minimize, but not eliminate, discharges from the Facility.

114.    Plaintiff is informed and believes, and thereon alleges, that there are also insufficient minimum BMPs implemented, such as good housekeeping.

115.    Plaintiff is informed and believes, and thereon alleges, that Defendant has failed to collect sufficient storm water samples for analyses, in violation of the Storm Water Permit, since at least April 13, 2018.

116.    Plaintiff is informed and believes, and thereon alleges, that storm water discharges containing excess levels of TSS, N+N, zinc, iron, pH, and aluminum occur each time storm water discharges from Facility in violation of the Storm Water Permit Sections III(C)–(D) and VI(A)–(B).

117.    Plaintiff is informed and believes, and thereon alleges, that the repeated and significant exceedances of NALs and Benchmark Levels demonstrate that the Owners/Operators have failed and continue to fail to develop and/or implement BMPs to prevent the exposure of pollutants to storm water and to prevent discharges of polluted storm water and non-storm water from the Facility.

118.    Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to evaluate the effectiveness of its BMPs and adequately revise the Facility SWPPP, despite repeated and significant concentrations of pollutants in Facility's storm water discharges. Further, Defendant has failed to make changes to the Facility's training programs, or make any other changes

1   based upon events that would signal a need for required revisions or alteration of

2   practices.

3       119.   Plaintiff is informed and believes, and thereon alleges, that pollutants,

4   including but not limited to those referenced herein, have been and continue to be tracked

5   throughout the Facility's operation areas.

6       120.   Plaintiff is informed and believes, and thereon alleges, that the

7   Owners'/Operators' failure to properly address pollutant sources and pollutants results in

8   the exposure of pollutants associated with its industrial activities to precipitation, and that

9   this results in discharges of polluted storm water from Facility and into local waterways

10  in violation of the Storm Water Permit and/or the CWA.

11      121.   Plaintiff is informed and believes, and thereon alleges, that the

12  Owners'/Operators' failure to properly address these pollutants and its sources results in

13  the exposure of pollutants to precipitation, which carries these pollutants with storm

14  water flows from Facility into the Receiving Waters.

15      **D.    Storm Water Discharges from the Facility**

16      122.   As discussed above and as detailed in the Facility SWPPP, storm water flow

17  is directed to a set of catch basins, Catch Basin 001 and Catch Basin 002 before it is

18  discharged to the City of Downey municipal storm drain on Pangborn Avenue, then into

19  the San Gabriel River and Pacific Ocean downstream.

20      123.   Plaintiff is informed and believes, and thereon alleges, that Astro Pak has

21  self-reported NAL exceedances from the Facility over the past five (5) reporting years.

22
23      **E.    The Facility's Storm Water Discharges to the Receiving Waters Contain
             Elevated Levels of Pollutants**

24      124.   Plaintiff is informed and believes, and thereon alleges, that pollutants from

25  the Facility discharge with storm water to the City of Downey municipal storm drains,

26  then into the San Gabriel River and Pacific Ocean downstream.

27      125.   Plaintiff is informed and believes, and thereon alleges, that the

28  Owners'/Operators' failure to properly address these pollutants and its sources results in

Complaint for Declaratory and Injunctive    25
and Civil Penalties Relief

the exposure of pollutants to precipitation, which carries these pollutants with storm water flows the San Gabriel River, its estuary, and the Pacific Ocean, all waters of the United States.

126.    Storm water discharges containing pollutants including, but not limited to, heavy metals such as zinc, lead, and copper, and iron adversely affect the aquatic environment.

127.    Samples of storm water discharges collected at the Facility contain pollutants including TSS, zinc, N+N, aluminum, and pH in excess of levels known to adversely impact aquatic species and the environment, federal regulations, WQS, Benchmarks, and/or the CTR (zinc, ) in violation of the Storm Water Permit's Effluent Limitations and Receiving Water Limitations.

128.    Plaintiff is informed and believes, and thereon alleges, that during and/or after every significant rain event exceeding either a 0.75-inch total storm event or a continuing 0.2-inch per hour storm event, or any other storm water or non-storm water discharge that has occurred at the Facility since April 13, 2018, through the present, Defendant has discharged and continues to discharge storm water and non-storm water from the Facility that contains concentrations of pollutants at levels that violate the prohibitions and limitations set forth in the Storm Water Permit, the technology-based Effluent Limitations, the Benchmarks, CTR, and/or the WQS.

**F.    Defendant's Violations of the Storm Water Permit's Sampling, Reporting, and Monitoring Implementation Plan Requirements**

129.    Plaintiff is informed and believes, and thereon alleges, that Defendant failed and continues to fail to develop an adequate Monitoring Implementation Plan ("MIP") for industrial operations at the Facility that complies with Section XI of the Storm Water Permit.

130.    Plaintiff is informed and believes, and thereon alleges, that Defendant failed and continues to fail to revise the MIP for the Facility as necessary to ensure compliance with the Storm Water Permit in violation of Section XI of the Storm Water Permit.

131.    Plaintiff is informed and believes, and thereon alleges, that Defendant failed and continues to fail to implement the MIP at the Facility, in violation of Section XI of the Storm Water Permit.

132.    Plaintiff is informed and believes, and thereon alleges, that Defendant failed and continues to fail to collect or analyze sufficient storm water samples at the Facility, in violation of Section XI of the Storm Water Permit.

133.    Plaintiff is informed and believes, and thereon alleges, that Defendant failed and continues to fail to adequately revise the MIP for the Facility as necessary to ensure compliance with the Storm Water Permit in violation of Section XI of the Storm Water Permit.

134.    Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators of the Facility consistently fail to prepare, implement, and report on its Water Quality Based Corrective Actions as required by the Storm Water Permit.

135.    Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators of the Facility have consistently failed and continue to fail to report any noncompliance with the Storm Water Permit at the time that the Annual Report is submitted.

136.    Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators did not report their non-compliance as required by the Storm Water Permit.

137.    Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators of the Facility fail to collect sufficient storm water samples during QSEs.

138.    Information available to Plaintiff is informed and believes, and thereon alleges, that the BMPs proffered as implemented in the Facility SWPPP are insufficient and ineffective in reducing pollutants to levels compliant with the Storm Water Permit and/or the CWA.

139.    Plaintiff is informed and believes, and thereon alleges, that Defendant has

failed to submit accurate Annual Reports to the Regional Board for the past five reporting years in violation of Section XVI of the Storm Water Permit.

140.    Plaintiff is informed and believes, and thereon alleges, that the Facility entered ERA Level 1 status during the 2020-2021 reporting year for TSS, iron, and N+N.

141.    Plaintiff is informed and believes, and thereon alleges, that in 2021-2022 and in every year thereafter, the Facility exceeded NAL for iron, thereby entering ERA Level 2 status.

142.    Plaintiff is informed and believes, and thereon alleges, that the Facility entered ERA Level 1 status during the 2021-2022 reporting year for aluminum.

143.    Plaintiff is informed and believes, and thereon alleges, that based on currently available data for the 2022-2023 reporting year, the Facility will enter ERA Level 2 status for aluminum and will remain at ERA Level 2 for iron.

144.    Plaintiff is informed and believes, and thereon alleges, that since at least 2020, the Owners/Operators have never submitted an ERA Level 1 or Level 2 report or revised the SWPPP accordingly in violation of the General Permit.

145.    Plaintiff is informed and believes, and thereon alleges, the Owners/Operators have failed to analyze stormwater samples for chemical oxygen demand or biological oxygen demand despite the fact that they are listed in the SWPPP's pollutant source assessment in violation of the General Permit. General Permit Section XI.B.6.

146.    Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators have failed to analyze stormwater samples for lead despite the fact that Reach 2 of the San Gabriel River, into which the Facility discharges, is impaired for lead in violation of the General Permit. General Permit Section XI.B.6.

## VI.    CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Discharges of Contaminated Storm Water in Violation of
the Storm Water Permit's Effluent Limitations and the Clean Water Act.
33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

147.    Plaintiff incorporates the allegations contained in the above paragraphs as

though fully set forth herein.

148.    Plaintiff is informed and believes, and thereon alleges, that Defendant failed and continues to fail to reduce or prevent pollutants associated with industrial activities at the Facility from discharging from the Facility through implementation of BMPs that achieve BAT/BCT.

149.    Plaintiff is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that do not achieve compliance with BAT/BCT standards from the Facility occur every time storm water discharges from the Facility. Defendant's failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the Storm Water Permit and the CWA. *See* Storm Water Permit, Sections I(D)(Finding 32)V(A); 33 U.S.C. § 1311(b).

150.    The Owners/Operators violate and will continue to violate the Storm Water Permit's Effluent Limitations each and every time storm water containing levels of pollutants that do not achieve BAT/BCT standards discharges from the Facility.

151.    Plaintiff is informed and believes, and thereon alleges, that the Owners'/Operators' violations of Effluent Limitations of the Storm Water Permit and the CWA are ongoing and continuous.

152.    Each day, since at least April 13, 2018, that the Owners/Operators discharge storm water containing pollutants in violation of the Storm Water Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

153.    By committing the acts and omissions alleged above, the Owners/Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from April 13, 2018 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

154.    An action for injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, Plaintiff's members, and the citizens of the State of California,

1    for which harm Plaintiff have no plain, speedy, or adequate remedy at law.

2    155.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because

3    an actual controversy exists as to the rights and other legal relations of the Parties.

4    WHEREFORE, Plaintiff prays for judgment against Defendant as set forth

5    hereafter.

6    ### SECOND CAUSE OF ACTION
7    **Defendant's Discharges of Contaminated Storm Water in Violation of
the Storm Water Permit's Receiving Water Limitations and the Clean Water Act.**
8    **33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

9    156.   Plaintiff incorporates the allegations contained in the above paragraphs as

10   though fully set forth herein.

11   157.   Plaintiff is informed and believes, and thereon alleges, that discharges of

12   storm water containing levels of pollutants that adversely impact human health and/or the

13   environment from the Facility occur each time storm water discharges from the Facility.

14   158.   Plaintiff is informed and believes, and thereon alleges, that storm water

15   containing levels of pollutants that cause or contribute to exceedances of water quality

16   standards, including but not limited to standards set forth in the applicable Basin Plan,

17   has discharged and continues to discharge from the Facility each time storm water

18   discharges from the Facility.

19   159.   The Owners/Operators violate and will continue to violate the Storm Water

20   Permit's Receiving Water Limitations each and every time storm water containing levels

21   of pollutants that adversely impact human health and/or the environment, and that cause

22   or contribute to exceedances of WQS discharges from the Facility.

23   160.   Plaintiff is informed and believes, and thereon alleges, that the

24   Owners'/Operators' violations of Receiving Water Limitations of the Storm Water Permit

25   and the CWA are ongoing and continuous.

26   161.   Each and every violation of the Storm Water Permits' Receiving Water

27   Limitations is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. §

28   1311(a).

162.    By committing the acts and omissions alleged above, the Owners/Operators
are subject to an assessment of civil penalties for each and every violation of the CWA
occurring from April 13, 2018 to the present, pursuant to Sections 309(d) and 505 of the
CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

163.    An action for injunctive relief under the Clean Water Act is authorized by
Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions
alleged above would irreparably harm Plaintiff, Plaintiff's members, and the citizens of
the State of California, for which harm they have no plain, speedy, or adequate remedy at
law.

164.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because
an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth
hereafter.

### THIRD CAUSE OF ACTION
**Defendant's Failure to Adequately Develop, Implement, and/or
Revise a Storm Water Pollutant Prevention Plan in Violation of the
Storm Water Permit and the Clean Water Act.
33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

165.    Plaintiff incorporates the allegations contained in the above paragraphs as
though fully set forth herein.

166.    Plaintiff is informed and believes, and thereon alleges, that the
Owners/Operators have failed and continue to fail to develop an adequate SWPPP for the
Facility, in violation of the Storm Water Permit.

167.    Plaintiff is informed and believes, and thereon alleges, that the
Owners/Operators have failed and continue to fail to adequately implement a SWPPP for
the Facility, in violation of the Storm Water Permit.

168.    Plaintiff is informed and believes, and thereon alleges, that
Owners/Operators have failed and continue to fail to adequately revise the SWPPP for
the Facility, in violation of the Storm Water Permit.

169.   The Owners/Operators have been in violation of the Storm Water Permit at the Facility every day from April 13, 2018, to the present.

170.   The Owners'/Operators' violations of the Storm Water Permit and the CWA at the Facility are ongoing and continuous.

171.   The Owners/Operators will continue to be in violation of the Storm Water Permit and the CWA each and every day the Owners/Operators fail to adequately develop, implement, and/or revise the SWPPP for the Facility.

172.   Each and every violation of the Storm Water Permit's SWPPP requirements at the Facility is a separate and distinct violation of the CWA.

173.   By committing the acts and omissions alleged above, the Owners/Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from April 13, 2018, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

174.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, their members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

175.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

## FOURTH CAUSE OF ACTION
### Defendant's Failure to Adequately Develop, Implement, and/or Revise a Monitoring and Reporting Plan in Violation of the Storm Water Permit and the Clean Water Act. U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

176.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

177.    Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to develop an adequate MIP for the Facility, in violation of the Storm Water Permit.

178.    Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to adequately implement an MIP for the Facility, in violation of the Storm Water Permit.

179.    Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to adequately revise an MIP for the Facility, in violation of the Storm Water Permit.

180.    The Owners/Operators have been in violation of the Storm Water Permit's monitoring requirements at the Facility every day from April 13, 2018 to the present.

181.    The Owners'/Operators' violations of its Storm Water Permit's monitoring requirements and the CWA at the Facility are ongoing and continuous.

182.    The Owners/Operators will continue to be in violation of Section XI of the Storm Water Permit, and the CWA each and every day they fail to adequately develop, implement, and/or revise an MIP for the Facility.

183.    Each and every violation of the Storm Water Permit's MIP requirements at the Facility is a separate and distinct violation of the CWA.

184.    By committing the acts and omissions alleged above, the Owners/Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from April 13, 2018, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

185.    An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, their members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

186.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because

an actual controversy exists as to the rights and other legal relations of the Parties. WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

## FIFTH CAUSE OF ACTION
**Defendant's Failure to Report as Required by the Storm Water Permit in Violation of the Storm Water Permit and the Clean Water Act.**
**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

187.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

188.   Section XVI of the Storm Water Permit requires a permittee to submit an Annual Report to the Regional Board by July 1 of each year. Section XVI of the Permit requires that the Annual Report include a compliance checklist that indicates that a discharger complies with and has addressed all applicable requirements of the Permit, an affirmation of visual observations and sampling results, an identification and explanation of any non-compliance, an identification of all revisions made to the SWPPP within the reporting year, and the date of the Annual Evaluation. Storm Water Permit, Section XVI. Laboratory reports of sample analysis, the annual comprehensive site compliance evaluation report, an explanation of why a permittee did not implement any activities required are also reporting requirements throughout the reporting year and are typically uploaded into the SMARTS portal.

189.   The Permit also requires a permittee whose discharges violate the Storm Water Permit's Receiving Water Limitations or water quality standards, such as, NALs, TMDLs, TMDL-Specific Numeric Action Levels and NELs to implement additional BMPs or other control measures that are tailored to that facility in order to attain compliance with the receiving water limitation. A Discharger that is notified by a Regional Board or who determines the discharge is causing or contributing to an exceedance of a water quality standard must comply with the Water Quality Based Corrective Actions in Section XX(B) of the Permit and report to the Regional Board regarding same. *See* Storm Water Permit, Section XX(B).

190. Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators have failed to accurately report their non-compliance with the Storm Water Permit and correctly report storm water sampling analysis compliance in the Facility's Annual Reports. As such, Defendant is in daily violation of the Storm Water Permit.

191. Further, Defendant have repeatedly failed to submit required ERA Level 1 and/or Level 2 Reports, despite entering into those levels for various constituents. As such, Defendant is in daily violation of the Storm Water Permit Section XII.

192. The Facility Owners/Operators have been in violation of Sections XII, XVI and XX of the Storm Water Permit since at least April 13, 2018.

193. The Owners'/Operators' violations of the reporting requirements of the Storm Water Permit and the CWA are ongoing and continuous.

194. By committing the acts and omissions alleged above, the Owners/Operators of the Facility are subject to an assessment of civil penalties for each and every violation of the CWA occurring from April 13, 2018, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

195. An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

196. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

## VII.  RELIEF REQUESTED

197. Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.      A Court order declaring Defendant to have violated and to be in violation of Sections 301(a) and (b) and 402 of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b) and 1342, for its unlawful discharges of pollutants from the Facility in violation of a permit issued pursuant to Section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to meet effluent standards limitations which include BAT/BCT requirements, and for failing to comply with the substantive and procedural requirements of the Storm Water Permit and the CWA;

b.      A Court order enjoining Defendant from violating the substantive and procedural requirements of the Storm Water Permit and Sections 301(a) and 402 of the CWA, 33 U.S.C. §§ 1311(a), 1342;

c.      A Court order assessing civil monetary penalties for each violation of the CWA occurring on or after November 2, 2015, of $59,937 per day, as permitted by 33 U.S.C. § 1319(d) and Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4;

d.      A Court order awarding Plaintiff its reasonable costs of suit, including attorney, witness, expert, and consultant fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d); and

e.      Any other relief as this Court may deem appropriate.


Dated: June 16, 2023                           Respectfully submitted,


                                               */s/* Jason R. Flanders
                                               Jason R. Flanders
                                               James T. Brett
                                               AQUA TERRA AERIS LAW GROUP
                                               Attorneys for Plaintiff
                                               LOS ANGELES WATERKEEPER